UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | CAUSE NO. 3:09-CR-113(01) RM |
| ) | |
| SETH R. KING ) | |

OPINION AND ORDER

Seth King moves to suppress the fruits of the search of his home and statements he made during and after that search. For the following reasons, the court grants the motion in part and denies it in part.

I

The Starke Circuit Court placed Mr. King on one year's probation on February 1, 2009 for felony resisting law enforcement and misdemeanor drunk driving. One condition of his probation was that he waive his Fourth Amendment rights and submit his person and place of residence to a reasonable search and seizure at any time by his probation officer or by a police officer in his probation officer's presence.

Annette Warkentien was Mr. King's probation officer. On May 15, Mr. King produced a urine sample that tested positive for methamphetamine. On June 1, Ms. Warkentien filed an affidavit with the Starke Circuit Court, which issued a warrant for Mr. King's arrest based on the alleged probation violation (using methamphetamine). Ms. Warkentien hadn't conducted a home visit since Mr. King

was placed on probation. She wanted to see if a methamphetamine lab was located at Mr. King's residence, so she called Indiana State Trooper Scott Gilbert. Ms. Warkentien told Trooper Gilbert about the warrant and asked him to contact her if he executed the warrant and accompany her to Mr. King's house for her home visit.

Mr. King testified without contradiction that he met with Ms. Warkentein in her office the day before the warrant was executed.

Mr. King had told Ms. Warkentien he was living with his father (though it turns out Mr. King was staying with his girl friend during the week). Trooper Gilbert learned Mr. King might be at the girl friend's residence and watched for Mr. King there for two hours on June 12. Trooper Gilbert drove away for the day, only to see Mr. King walking along the street, talking on his cell phone. Trooper Gilbert agreed to let Mr. King finish the call, then handcuffed him and placed him in the police car.

Trooper Gilbert took Mr. King to Mr. King's father's home. There is conflicting evidence as to how the destination was announced: Trooper Gilbert testified that Mr. King asked to be taken to his father's home, while Mr. King testified that Trooper Gilbert simply said they were going to Mr. King's father's home. The latter account is more sensible in light of Ms. Warkentien's earlier request that Trooper Gilbert escort her on a home visit. In any event, they went in Trooper Gilbert's squad car to the senior King's home, where they met Ms. Warkentien.

2

There also is an evidentiary dispute about what happened at the King residence. The court credits the testimony of Ms. Warkentien and Trooper Gilbert with respect to those events. Mr. King and his father seem to recall the presence of people who don't appear to have been present during the search.

At the front door with Mr. King and Trooper Gilbert, Ms. Warkentien knocked on the door of the trailer and opened it. Mr. King's father, Dennis King, greeted them. Ms. Warkentien explained she was there to conduct a home visit, and Dennis King said okay. Ms. Warkentien didn't seek or obtain Dennis King's written consent. Trooper Gilbert and the handcuffed Seth King entered the living room to wait inside.

Ms. Warkentien checked each of the rooms in the trailer, looking for a meth lab or any other signs of non-compliance with the probation. In one bedroom, Ms. Warkentien saw guns leaning against a wall. She asked Trooper Gilbert and Mr. King to come back to that room. Ms. Warkentien asked Mr. King if that was his bedroom, and Mr. King said it was. Ms. Warkentien reminded Mr. King he wasn't to possess any firearms while on probation. Mr. King said one of the guns was one his grandfather had given him. Trooper Gilbert asked Mr. King if he wanted to talk about methamphetamine, and Mr. King simply started to walk toward the front of the trailer and said to take him to jail.

Ms. Warkentien, Trooper Gilbert, and Mr. King returned to the living room area to wait for another officer to take Mr. King to jail. Trooper Nathan Sherer arrived and took Mr. King to jail.

Trooper Gilbert notified fellow Indiana State Police Trooper and ATF Task Force member Mary Hewitt about the day's events, telling her that Mr. King had asked to be taken to jail. Ms. Hewitt went to the jail with another agent to speak with Mr. King on June 15.

Trooper Hewitt began the interview by telling Mr. King that it was totally up to him as to whether he wanted to talk to her. She explained that she and the other Task Force member were "the federal gun police." As Trooper Hewitt told Mr. King she needed to inform him of his rights, Mr. King asked, "Is this about the guns?" Trooper Hewitt said it was about "the whole arrest." After reading the *Miranda* rights, Trooper Hewitt asked, "Any questions over those rights as I've read them?" Mr. King responded, "Yeah, I don't want to say anything." Trooper Hewitt said, "You don"t want to talk to us at all? Okay. All right." Mr. King interrupted: "I don't want to be rude, but you know . . . ." Trooper Hewitt said, "That's fine. It's your – it's one of your rights. If you don't want to talk to us that's fine. Just wanted to get your side of what happened on Friday and how you come to be a guest here at Starke County, so . . ." Mr. King then volunteered that the guns hadn't been used in a shootout. Trooper Hewitt said she couldn't talk to Mr. King any more and terminated the interview.

II

Mr. King's suppression motion requires three separate analyses. First, he contends that the search of the trailer where he lived with his father was

4

unreasonable. Second, he contends that his statements at the trailer resulted from custodial questioning not preceded by *Miranda* warnings. Third, he contends that his statements at the jail resulted in continued police questioning after he invoked his right to remain silent.

A

Probation is a special need of the state that warrants a degree of impingement on privacy that would be unconstitutional if applied to the public at large. Griffin v. Wisconsin, 483 U.S. 868, 875 (1987). Whether a probationary search is constitutional requires consideration of how the courts of the state in which the search occurred interpret probationary conditions. Id. Indiana law authorizes a probation officer to "search a parolee's person or property if he has reasonable cause to believe that the parolee is violating or is in imminent danger of violating a condition to remaining on parole." IND. CODE § 11-13-3-7(a)(6). There must be at least "a reasonable suspicion that the conditions of probation are being violated in order for a probation search to be reasonable." Fitzgerald v. State, 805 N.E.2d 857, 865 (Ind. Ct. App. 2004).

Analysis under Indiana law turns on whether the search was probationary or investigatory. *See, e.g.*, Bonner v. State, 776 N.E.2d 1244, 1250 (Ind. Ct. App. 2003); Allen v. State, 743 N.E.2d 1222, 1228 (Ind. Ct. App. 2001). Mr. King argues that because a probation violation warrant had been issued for his arrest, Ms. Warkentien's search of the family residence was investigatory rather than

5

probationary. The Indiana cases Mr. King cites for that proposition don't support his reading of Indiana law.

In <u>Allen v. State</u>, 743 N.E.2d 1222, police officers who were investigating a series of burglaries were informed that Steve Allen (one of the suspects) had been seen with a pistol. The officers notified Mr. Allen's parole officer, who went to Mr. Allen's residence with the police officers and conducted a search. The probation officer found not only the pistol, but a variety of items taken in the burglaries. Mr. Allen moved to suppress, claiming that the search was investigatory rather than probationary. The probation officer testified that his main objective was to learn whether Mr. Allen possessed firearms in violation of his parole status, and the officers testified that they hadn't expected to find the stolen items at Mr. Allen's residence. The court of appeals agreed with the trial court "that the search was a true 'probation' search conducted pursuant to Allen's parole agreement." 743 N.E.2d at 1228.

In <u>Bonner v. State</u>, 776 N.E.2d 1244, two county police officers accompanied the probation officer on a routine "probation sweep to verify Mr. Bonner's address." 776 N.E.2d at 1246. One of the officers saw Frank Bonner trying to leave the house, and the officer handcuffed Mr. Bonner. The probation officer then ordered the county officers to search the house. The court explained that such searches foster probationary restrictions "designed to ensure that the probation serves as a period of genuine rehabilitation and that the public is not harmed by a probationer living within the community." 776 N.E.2d at 1247. The

court defined the line that distinguishes probationary searches from investigative searches: "If the search was not conducted within the regulatory scheme of probation enforcement, then it will be subject to the usual requirement that a warrant supported by probable cause be obtained." 776 N.E.2d at 1250. The search of Mr. Bonner's home, the court held, was probationary.

Nothing in Allen v. State or Bonner v. State suggests that a search conducted by a probation officer ceases to be a probationary search once a probation violation warrant has been issued and executed. Nothing in this record suggests that Mr. King, after being arrested on the warrant, would be disallowed bond or would be unable to post bond. Nothing in this record indicates that anyone could be certain even that Mr. King's probation would be revoked based on a single drug test. Probation Officer Warkentien, then, had every reason to think Mr. King would return within days to the trailer where he lived with his father. Few things pose greater impediment than an on-site methamphetamine lab to probation serving "as a period of genuine rehabilitation and that the public is not harmed by a probationer living within the community." Bonner v. State, 776 N.E.2d at 1247. Nothing in this record suggests it was unreasonable for Ms. Warkentien to suspect that a lab might be nearby when a probationer in rural Starke County tests positive for methamphetamine. *See* Fitzgerald v. State, 825 N.E.2d 857, 865 (Ind. Ct. App. 2004) (probation search is reasonable if a reasonable suspicion exists that probation conditions are being violated).

7

This was a reasonable probationary search. The court denies Mr. King's suppression motion to the extent it seeks to suppress the fruits of that search.

B

Mr. King moves to suppress, on *Miranda* grounds, his statements after Ms. Warkentien's question during the probationary search about whether the room with the guns was his room. Warnings about certain Fifth and Sixth Amendment rights must precede custodial government interrogation. Illinois v. Perkins, 496 U.S. 292, 297 (1990); Miranda v. Arizona, 384 U.S. 436, 448-450 (1966). A person is not in custody simply because his residence is being searched, *see* United States v. Salyers, 160 F.3d 1152, 1159-1160 (7th Cir. 1998), or simply because he is meeting with his probation officer, Minnesota v. Murphy, 465 U.S. 420, 429-434 (1984), but Mr. King had been arrested alongside the road, handcuffed, and transported in a police car to the scene of the search. The record contains no hint that he was free to leave. He was in custody. *See* United States v. Abdulla, 294 F.3d 830, 834 (7th Cir. 2002) ("An individual is considered 'in custody' when his movement is restrained to the degree comparable to a formal arrest.").

The government doesn't argue that Ms. Warkentien's question wasn't government interrogation because she was a probation officer rather than a police officer, and the court has no reason to believe such an argument would succeed. Instead, the government argues that Ms. Warkentien's question didn't amount to interrogation because had Mr. King said the room was not his, further

8

investigation of the guns in the room would have been unnecessary. The government cites no authority for this proposition, and it doesn't seem to harmonize with other authority.

This was not an emergency situation, as existed in Vickers v. Stewart, 144 F.3d 613, 616-617 (9th Cir. 1998), or a question that was a spontaneous reaction to a startling event, as in Garcia v. Singletary, 13 F.3d 1487, 1491-1492 (11th Cir. 1994), and unlike United States v. Klein, 13 F.3d 1182, 1184 (8th Cir. 1994), Mr. King was in custody. Further, this was not a routine booking question, *see* United States v. Henley, 984 F.2d 1040, 1042-1043 (9th Cir. 1993) ("[T]he agent knew before approaching Henley that there was some doubt about who owned the vehicle[;] he asked Henley 'if he was purchasing' the car or was in the process of doing so. . . . An officer investigating a bank robbery who has the getaway car but isn't sure who owns it should well know that asking a suspect if he's the owner of the vehicle is reasonably likely to elicit an incriminating answer."), or general on-the-scene questioning, *see* Garcia v. Singletary, 13 F.3d 1487, 1491-1492 (11th Cir. 1994) ("[T]he facts demonstrate that Deputy Gardner's question was a spontaneous reaction to a startling event. Immediately after arriving on the scene of the incident, Deputy Gardner sought to determine how the fire had started. After directing Garcia out of the cell, Gardner asked him why he started the fire. Gardner did not threaten Garcia or in any other way force him to answer. Garcia voluntarily responded."). This was a question about the ownership of a room that contained what was, for the custodial interrogee, contraband.

Mr. King's statement was the result of custodial government interrogation without benefit of *Miranda* warnings. The court grants Mr. King's motion to suppress his June 12 statements following Ms. Warkentien's question about whether a particular bedroom was Mr. King's.

C

Finally, Mr. King moves to suppress his June 15 statement to Trooper Hewitt after he told Trooper Hewitt he didn't want to say anything. Mr. King contends that Trooper Hewitt's statement that she just wanted to let Mr. King give his side of the story was designed to get Mr. King to talk notwithstanding his assertion of his right to remain silent.

For purposes of the *Miranda* warning, "interrogation" is "express questioning or its functional equivalent," Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980) ("[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."), including psychological ploys. Arizona v. Mauro, 481 U.S. 520, 526 (1987). Subtle compulsion is not the equivalent of interrogation unless the officers should have known the compulsion

was reasonably likely to elicit an incriminating response. Rhode Island v. Innis, 446 U.S. at 303.

Mr. King's argument would have been stronger had Trooper Hewitt's comment come immediately after Mr. King said he didn't want to talk. But it didn't. Instead, Trooper Hewitt said, "You don't want to talk to us at all? Okay. All right." Mr. King interrupted Trooper Hewitt with a semi-apology, saying he didn't want to seem rude. Trooper Hewitt's next comment responded to Mr. King's stated regret at seeming rude; it was in the nature of an assurance rather than coaxing: "That's fine. It's your – it's one of your rights. If you don't want to talk to us that fine. Just wanted to get your side of what happened on Friday and how you come to be a guest here at Starke County, so . . . ." When viewed in context, Trooper Hewitt's reassurance was no more likely to elicit an incriminating response from Mr. King than the statement of a police officer who, when an arrestee said a search would disclose nothing other than a pistol, said something larger than a pistol had been found. *See* United States v. Hendrix, 509 F.3d 362, 374 (7th Cir. 2007) ("Hendrix was not the victim of a 'coy' discussion that forced him to make the damning admissions about his knowledge and ownership of the firearm. Rather, Hendrix was simply talking when he should not have been. Hendrix repeatedly reinitiated the conversation with Officer Moore. He was neither coerced nor compelled by Officer Moore to talk about his firearm, but rather encouraged the discussion by asking Officer Moore questions and volunteering information.").

Trooper Hewitt informed Mr. King of his rights under *Miranda* and conducted no further interrogation after Mr. King said he didn't want to answer questions. Mr. King volunteered information after that occurred, but his doing so didn't trigger any exclusionary rule.

III

For these reasons, the court GRANTS Mr. King's suppression motion [docket #18] to the extent it seeks to exclude his statement on June 12 in response to Annette Warkentien's asking whether the room in which the guns were seen was Mr. King's room and DENIES the motion in all other respects.

Trial of this cause remains scheduled for February 9, 2010 at 9:30 a.m. in the third floor courtroom.

SO ORDERED.

ENTERED:  December 30, 2009

                          /s/ Robert L. Miller, Jr.
                          Chief Judge
                          United States District Court